J-S05042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT BOOTH | : | |
| | : | |
| Appellant | : | No. 1303 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 4, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005705-2015

BEFORE:  BOWES, J., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED:  JUNE 4, 2021**

Robert Booth appeals from the judgment of sentence following his convictions for Involuntary Deviate Sexual Intercourse and Sexual Assault.[1] He challenges the weight of the evidence, rulings on evidence, and the denial of his request to call a defense witness. We affirm based on the opinion of the Honorable Jeffery Minehart.

The charges at issue stem from Booth's sexual abuse of his niece, J.L.M. Before trial, the Commonwealth filed a motion *in limine* to introduce the testimony of Booth's former stepdaughter, J.M. – also referred to in the record as "J.G." – and her cousin, H.L., regarding Booth's alleged sexual assaults of them. Following a hearing, the court granted the motion because "there [was]

---

[1] 18 Pa.C.S.A. §§ 3123(a)(7) and 3124.1, respectively.

a sufficient nexus and that the facts alluded to in each statement are strikingly similar." N.T., Motions Hearing, 9/11/18, at 35.

> Specifically, all the victims that [Booth] is alleged to have sexually assaulted were young girls and [the abuse] started prior to the child being the age of nine, . . . all of the victims were sexually assaulted or alleged to have been sexually assaulted by [Booth] for several years, all of them had a familial relationship with the defendant or were close family friends, all of the assaults occurred in [Booth's] home when a child would spend time, reside or spend the night. [Booth] wore stockings when he was alleged to have sexually abused each victim. [Booth] allegedly showed pornography to each victim, all of the assaults involved similar sexual acts. [Booth] would either be completely naked or wearing just stockings when around two of the victims. Also in each of them, specifically J.G. and H.L., that [Booth] rubbed his penis and testicles against the feet of each girl and all of the assaults occurred when no adults were present. Additionally, the time span of the assaults is similar in time. There is a nexus within the time. Those are the most compelling factors that this [c]ourt has taken in to account under **Commonwealth v. Hughes,** 521 Pa. 459, which is a 1989 case which the Court directed us to look at factors including age, race, physical appearance of the victims involved, date, location of each crime, relationship to the defendant to each victim and the specific acts the defendant is alleged to have committed with each victim.

**Id.** at 35-37.

Following a bench trial, the trial court found Booth guilty of the above offenses and sentenced him to two to four years' incarceration followed by three years' probation. Booth filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Booth raises the following issues before this Court:

I. Was the verdict of guilt against the weight of evidence?

II. Did the trial court commit reversible error by permitting the testimony of two other accusers concerning uncharged misconduct?

III. Did the trial court commit reversible error by restricting the scope of cross-examination of the complaining witness on issues of bias and motive?

IV. Did the trial court commit reversible error by precluding the defense from introducing material fact witnesses that would have undermined the credibility of the accusations and exonerated [Booth]?

Booth's Br. at 8 (suggested answers omitted).

Booth argues that the verdict was against the weight of the evidence because the victim's testimony was "scant, conflicting, and incompetent[.]" *Id.* at 21. Booth states that despite the victim's claims of sexual assault, she "reached out to [Booth] when she needed help, needed things fixed, needed a place to stay, needed a babysitter for her kids and when she needed a vacation." *Id.* He argues that "[i]t defies logic that [the victim] would have delved into such involvement with [Booth] had the accusations been true." *Id.*

We review a challenge to the weight of the evidence as follows:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial

is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (citations omitted). The uncorroborated testimony of a victim, if believed by the factfinder, can be sufficient to convict. *Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa.Super. 2006). "It [is] within the province of the . . . fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge [the defendant] guilty [or not guilty]." *Id.*

Here, the trial court denied Booth's challenge to the weight of the evidence. Sitting as factfinder, the trial court found the victim's testimony credible despite the alleged inconsistencies Booth sees in it. Trial Court Opinion, filed Aug. 13, 2020, at 18 ("1925(a) Op."). As to Booth's argument that the victim's continued involvement with him rendered her testimony suspect, the trial court concluded that such actions "did not call into question this [c]ourt's assessment of the credibility of the complainant." *Id.* at 19. The trial court noted that Booth's violations of the victim occurred when she was young and "family dynamics made her reluctant to accuse [Booth] of molesting her." *Id.* Upon review of the parties' briefs, the certified record, and applicable case law, and the well-reasonable trial court opinion, we affirm on the basis of the trial court opinion.

Next Booth argues that the trial court erroneously allowed the testimony of Booth's former stepdaughter and her cousin. He maintains that the

testimony was irrelevant and prejudicial because it "lack[ed] any striking similarities or close factual nexus to the conduct for which [Booth] was on trial[.]" Booth's Br. at 22.

We review the admission of evidence for an abuse of discretion. ***Commonwealth v. Elliott***, 80 A.3d 415, 446 (Pa. 2013). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Commonwealth v. Santos***, 176 A.3d 877, 882 (Pa.Super. 2017) (quoting ***Commonwealth v. Antidormi***, 84 A.3d 736, 749–50 (Pa.Super. 2014)). Rule 404(b) of the Pennsylvania Rules of Evidence bars admission evidence of prior bad acts to establish a person's character and to prove that the person acted on a particular occasion in conformity with that character. Pa.R.E. 404(b)(1). However, evidence of prior bad acts is permissible for some other, proper purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). In a criminal case, "this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." ***Id.***

Here, the trial court granted the motion *in limine* because the evidence in question was admissible to show a common plan, scheme, or design. ***See*** 1925(a) Op. at 23. The court noted that to establish a common plan, scheme, or design, the proponent of the evidence need only show "'that there are

- 5 -

**shared similarities in details** of each crime' and that these similarities may include the perpetrator's actions, the location of the crimes, and the commonality in the relationship of the accused and the victims." *Id.* (quoting *Commonwealth v. Newman*, 598 A.2d 275, 278 (Pa. 1991)) (emphasis added).

In the instant case, the trial court concluded that there were multiple similarities in the crimes, including that Booth victimized young female relatives; he wore stockings during some of the assaults; the victims were of similar ages at the times of the assaults; and he used similar methods to make them comfortable.

> Instantly, [Booth] victimized young girls each of whom had family ties to him. He used similar methods to make them comfortable, such as the use of video games and pornography, and slowly groomed them to accept his advances. He also took advantage of his position as an adult figure in their lives to silence them and usually acted in the afternoon while serving as a baby sitter of sorts to the victims. In addition, with some of the victims, he wore women's stockings and with others exhibited a foot fetish. Also, the victims were similar in age and thus, particularly vulnerable and their families either were related to [Booth] or friends with him.

*Id.* at 24.

The trial court also concluded that the probative value of the evidence outweighed the potential for unfair prejudice because Booth was tried before a judge sitting without a jury, and a judge is presumed not to "misuse the evidence or consider it as propensity evidence." *Id.* at 27. We discern no abuse of discretion.

- 6 -

Booth also argues that the trial court "erred in restricting the scope of the cross-examination of the [victim] on issues of bias and motive." Booth's Br. at 30. He maintains that he should have been able to "introduce photographs that would have ultimately exonerated [him] because the evidence would have completely undermined the credibility of [the victim]." *Id.* These photographs pictured the victim and Booth together after the incidents of abuse. *Id.* at 32. He alleges that the photographs "would have supported the defense theory that the complaining witness' bias against, and motive to falsely accuse [Booth] was rooted in being asked to leave [Booth's] shore house in 2013." *Id.*[2]

The trial court has discretion in determining the scope of cross-examination, and we do not reverse such determinations absent an abuse of that discretion. *Commonwealth v. Largaespada*, 184 A.3d 1002, 1009 (Pa.Super. 2018). A trial court may exclude relevant evidence for numerous reasons, including where the evidence is cumulative. *See* Pa.R.E. 403. Cumulative evidence is "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." *Commonwealth v. Flamer*, 53 A.3d 82, 88 n.6 (Pa.Super. 2012) (citation omitted).

---

[2] To the extent Booth makes passing references to the Confrontation Clause, he waived any claim of a violation of that clause by failing to mention it in either his Pa.R.A.P. 1925(b) statement or his Statement of Questions Involved. *See* Booth's Br. at 8, 33.

The trial court did not abuse its discretion in limiting Booth's cross-examination of the victim. Sitting as factfinder, the trial court heard evidence regarding the victim's continued contact with Booth after the assault. This evidence came by way of the victim herself, such as her testimony that she visited Booth's shore house long after the sexual abuse, as well as in the form of photographs of her and Booth together. **See** 1925(a) Op. at 28-29 (citing N.T., Trial, 10/4/19, at 108, 119-120, 123-124, 143-145, 147-148, 203-206); N.T., Trial, 10/4/19, at 149-152. The trial court limited the scope of cross-examination concluding that "no useful purpose would have been served by presenting additional evidence cumulative to what already had been established by previously admitted evidence." 1925(a) Op. at 29. The additional photographs that Booth wanted to introduce would have merely been cumulative, and the trial court's ruling was not an abuse of discretion.

Booth's final claim is that the trial court erred in precluding him from calling a fact witness, the victim's brother.[3] He alleges that the victim's brother would have testified that the victim "invited [Booth] to her house to do handyman type jobs well after the alleged unlawful acts underlying the case." Booth's Br. at 34-35. He maintains that this testimony contradicted the victim's version of events and would have exposed the victim's bias and motive.

---

[3] His Pa.R.A.P. 1925(b) statement identified two additional witnesses; he has abandoned that aspect of this issue.

This is another challenge to the admission of evidence, which we review for an abuse of discretion. **Elliott**, 80 A.3d at 446. As discussed earlier, a trial court may exclude relevant evidence that is cumulative of other evidence. **See** Pa.R.E. 403; **Flamer**, 53 A.3d at 88 n.6.

Here, as above, the trial court heard testimony, including from the victim herself, that she remained in contact with Booth even after his acts of sexual abuse against her. Therefore, the trial court concluded that the proposed testimony of the victim's brother would have been cumulative and unnecessary.

> [T]he testimony [Booth] wished to present would have been cumulative of testimony and evidence already presented. . . . . [T]his [c]ourt heard from various witnesses, including the [victim], that the [victim] had contact with [Booth], often at her behest, on numerous occasions and that she wanted to visit [Booth's] shore house. Additional evidence on that issue therefore was not necessary and would not have either made the point clearer for this [c]ourt or, more importantly, resulted in a different outcome.

1925(a) Op. at 30.

Upon review of the record, we discern no abuse of discretion by the trial court in precluding the testimony of the victim's brother. The evidence was cumulative. We therefore affirm the judgment of sentence based on the well-reasoned opinion of the Honorable Jeffrey Minehart.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/4/21

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION-CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA

v.

ROBERT J. BOOTH, JR.

: PHILADELPHIA COURT
: OF COMMON PLEAS
: CRIMINAL TRIAL DIVISION
:
: CP-51-CR-0005705-2015
:
:
:
:

## OPINION

**MINEHART, J**

Robert J. Booth, Jr. (hereinafter "Appellant") appeals from the judgment of sentence of two to four years' incarceration followed by three years' probation imposed upon him by this Court on February 4, 2020, following his conviction for the crimes of involuntary deviate sexual intercourse of a child less sixteen years' old, graded as a felony of the first degree and sexual assault.[1] This Court found Appellant guilty of the above charge after a waiver trial held before this Court on October 4, 2019.[2] Following the imposition of sentence, Appellant filed a timely post-sentence motion, which was denied on June 10, 2020, by operation of law. Appellant then filed a timely notice of appeal and a court-ordered Pa.R.A.P 1925(b) Statement of Matters.

---

[1] This matter was originally assigned to the Honorable Charles J. Cunningham, III, judge of the Court of Common Pleas of Philadelphia County for trial. While the case was still assigned to him, Judge Cunningham granted Appellant's Motion to Dismiss based on a due process laches claim. The Commonwealth appealed and on July 7, 2017, the Superior Court vacated Judge Cunningham's order and remanded the matter for trial. Commonwealth v. Booth, 175 A.3d 360 (Pa. Super. 2017) (Table). The Pennsylvania Supreme Court thereafter denied a petition filed by Appellant seeking the grant of an allowance of appeal. Commonwealth v. Booth, 182 A.3d 433 (Pa. 2017( (Table). Following remand this Court was administratively assigned to try the matter. On September 11, 2018, the Honorable Mia Perez of the Court of Common Pleas of Philadelphia County held a hearing on the Commonwealth's Motion to Introduce other Bad Acts under Pa.R.E. 404(b). At the conclusion of the hearing, Judge Perez granted the Commonwealth's motion.

[2] Pursuant to the agreement of the parties, this Court vacated the sexual assault conviction.

1

## FACTUAL HISTORY

When she was in her thirties, the complainant herein accused Appellant, her uncle, of engaging in illegal sexual conduct and acts with her between 1988 and 1991, when she was between 8 and 11 years' old.[3] These acts occurred at her grandmother's house located on Akron Street in Philadelphia only between 3:30 and 4:00 p.m. when Appellant watched her after school and during the summer because her mother was at work and could not watch her. (N.T. 10/4/19, 97-98, 106-107). Appellant would have her come to his bedroom by asking her to play video games. (N.T. 10/4/19, 98, 121-122). When she went to her grandmother's house, her grandmother also would usually be present inside the residence but the television would often be on and she sometimes went out to visit friends . (N.T. 10/4/19, 98, 122).

Initially, when the complainant would go upstairs to play video games, she and Appellant would only play video games. (N.T. 10/4/19, 99). At some point though, after she would go to the bathroom, Appellant began placing pornographic magazines on the bed for her to see once she returned to the bedroom where the video game console was. (N.T. 10/4/19, 99-100). At the time, Appellant would be partly undressed and would be wearing woman's fishnet stockings that did not hide his penis, which he would put erect against her vagina as he simulated having intercourse with her. (N.T. 10/4/19, 99-100, 103). After more time passed, he began asking the complainant if she thought the women in the magazine photographs were beautiful and if she would pose for him like the women in the photographs were posing, which she eventually agreed to do. (N.T. 10/4/19, 99). Appellant would take off her uniform jumper and have her pose on the bed wearing her tights and shirt after he opened her shirt partway and also have her touch her vagina and breasts. (N.T. 10/4/19, 99-100, 105).

---

[3] The complainant has the same initials as another witness. For ease of review and to avoid confusion, she will be referred to herein as the complainant.

2

In addition to the foregoing, Appellant began to rub his feet against her vagina. (N.T. 10/4/19, 100). He eventually began putting his mouth on the part of her tights covering her vagina and eventually began taking off her tights to perform cunnilingus upon her when she was about eight and one-half to nine years' old. (N.T. 10/4/19, 100-101). He also would stick his fingers in her vagina, touch her breasts, kiss her, and say that he liked it when she called him her boyfriend. (N.T. 10/4/19, 104-105). The complainant could not recall how many times Appellant engaged in this activity with her because of how many times it occurred. (N.T. 10/4/19, 104). Appellant told the complainant not to tell anyone about what was happening because no one would believe her. (N.T. 10/4/19, 105). The complainant did as she was told and did not tell anyone about the incidents when they were occurring. (N.T. 10/4/19, 107).

During that three-year period, the complainant's parents were going through a divorce. As a result of that and because she believed that her grandmother had to know what was occurring, given how long she would be upstairs with Appellant and her grandmother had done nothing to stop it, she believed that she was all alone and had no one tell. (N.T. 10/4/19, 106-107).

The complainant first told someone about the incidents in about 2002 when she told her then boyfriend, who she later married, about what Appellant did to her. (N.T. 10/4/19, 108). The second person she discussed the incidents with was her cousin J.M. and the third H.L., another relation, in 2011 after she contacted them using Facebook. (N.T. 10/4/19, 108, 110-111). The complainant used to babysit for J.M. and her father was Appellant's best friend. (N.T. 10/4/19, 108, 110-111). When corresponding with J.M., the complainant told J.M. that Appellant gave her marijuana when she was eleven years' old and had had sexual contact with her. (N.T. 10/4/19, 153).

3

The complainant did not go to the authorities until 2014 after speaking to counselors who told her that it was likely that Appellant victimized others. (N.T. 10/4/19, 108-110). She added that she revealed that Appellant had molested her because she was troubled by a divorce she was going through at the time, had been introduced to drugs by Appellant at an early age, had suffered the sexual abuse she described, which made her use illicit drugs, promiscuous, was suicidal, and at the time Appellant had access to other young female relatives. (N.T. 10/4/19, 108-110, 113-114).

Although the complainant knew that there had been a criminal incident involving Appellant and J.M. that occurred before 2011, the complainant did not know the details underlying it until she contacted J.M. in 2011. (N.T. 10/4/19, 110).

In 1998, the complainant's mother evicted the complainant because of bad behavior. (N.T. 10/4/19, 112). At the suggestion of her grandmother she began living with J.M., J.M.'s mother, and Appellant, in Delaware for three or four months. (N.T. 10/4/19, 113). The complainant hated living there and still ingested drugs while there. (N.T. 10/4/19, 108, 110-111). While there, she had little contact with J.M. and did not know that Appellant had also molested J.M. (N.T. 10/4/19, 113). The complainant did not tell anyone about what Appellant had done to her before she moved to Appellant's residence or while residing there. (N.T. 10/4/19, 138). She did, however, observe Appellant engaging in similar conduct with J.M. that he had engaged win with her and also heard him say sexually suggestive things at times. (N.T. 10/4/19, 139-140). She did not say anything at the time because she had no proof that he was committing inappropriate acts with J.M. and she had her own problems. (N.T. 10/4/19, 141).

The complainant eventually also told her mother about what Appellant did to her after speaking to detectives in 2014. (N.T. 10/4/19, 114, 134). Her mother initially was sympathetic.

4

However, after her mother said that she did not believe J.M. and her claim that appellant molested her. She told the complainant that maybe Appellant had not molested her, and that the complainant may have misinterpreted what had occurred between herself and Appellant. (N.T. 10/4/19, 135-136).

The complainant discussed with Appellant what Appellant did to her on one occasion when she was twenty after she told him that she could not believe what he had done to her and J.M. (N.T. 10/4/19, 115). He told the complainant that she wanted to participate and undress herself for him and that he did not do anything she did not want him to do. (N.T. 10/4/19, 115).

When the complainant was eleven years' old the assaults stopped because Appellant moved out of his mother's house and moved in with J.M.'s mother after they married. (N.T. 10/4/19, 116). The complainant thereafter would often see Appellant on various occasions at family events. (N.T. 10/4/19, 108, 116-117).

On cross-examination, the complainant admitted that her grandmother had a nickname given to her because of how tuned in and aware she was to whatever was going on, her grandmother's house was small, in 2006, she and her son were standing next to Appellant in a family photograph, and she and Appellant often appeared in photographs together. (N.T. 10/4/19, 108, 119-120, 123-124, 147-148). When confronted with the fact that Appellant was working at a nine to five job and thus was working during the time when the incidents the complainant described occurred, the complainant affirmed that the incidents occurred and the dates and times did not matter. (N.T. 10/4/19, 127). With regard to the various photographs showing her and Appellant together, she explained that Appellant was present during the events when the photos were taken because her grandparents wanted him present. (N.T. 10/4/19, 147-148). She added that she had to play along with the lie that nothing had occurred because her

5

family did not believe J.M. when she said Appellant had molested her. (N.T. 10/4/19, 148).

The complainant admitted that after she told her husband about the incidents, she and he both would have Appellant over to their home to repair various things. (N.T. 10/4/19, 145). She explained that he was the only person in the family that had the skills to fix and build things. (N.T. 10/4/19, 143-145). She also admitted giving Appellant a birthday card and going to the shore when he was there but only because the entire family was there as well. (N.T. 10/4/19, 148-.149). She denied being asked to leave the shore house or wanting her children to go to the shore without her when Appellant would be there. (N.T. 10/4/19, 149-150).

The complainant's cousin, J.M., also was a victim of Appellant, her step-father. She accused him of having illegal sexual contact with her from when she was five until she was fourteen years' old. (N.T. 10/4/19, 22). At the time when the incidents occurred, J.M. and her mother resided with Appellant in a house in Philadelphia. (N.T. 10/4/19, 21).[4] According to J.M., Appellant often engaged in inappropriate behavior with her that included referring to her as his girlfriend and he her boyfriend, kissing her on her lips, walking around essentially naked while wearing woman's sheer stockings, and giving her baths from when she was five while he was wearing sheer stockings that exposed his genitalia. (N.T. 10/4/19, 22, 25-28). He also wrestled and tickled her from when she was six until she was ten or eleven years' old when she began resisting him. (N.T. 10/4/19, 23). He often held her down as he tickled her. (N.T. 10/4/19, 23). As he did this, he often would get an erection and sometimes bite her on her buttocks either directly or through her pants. (N.T. 10/4/19, 23, 29-30).

J.M. also recalled waking up and finding Appellant on top of her as he roughhoused and tickled her ostensibly to make it appear that he was trying to wake her up. (N.T. 10/4/19, 23).

_____

[4] Appellant and J.M.'s mother divorced when J.M. was sixteen and she and her mother moved to Delaware. (N.T. 10/4/19, 21).

6

When she was eleven, at about 5:30 a.m., a couple of hours before she had to get up for school, J.M. awakened and found Appellant rubbing his penis against her feet. (N.T. 10/4/19, 23). J.M. told her to leave the room and that morning during breakfast Appellant accused her of being "mean" to him because all he was doing was trying to be nice by giving her a massage. (N.T. 10/4/19, 24). She retorted that she did not have to be up for another hour. (N.T. 10/4/19, 24). Also when she was eleven, appellant made comments telling her that it was time for her to start shaving her pubic hair and that he'd help her do it. (N.T. 10/4/19, 24).

While living with Appellant, he would tell J.M. that her mother would not have sex with him and he sometimes had J.M. try on form-fitting clothing her mother would not wear. (N.T. 10/4/19, 25, 84). He also had her put on stockings after which he would rub her feet. (N.T. 10/4/19, 25). All of the sexual attention Appellant showed J.M. led her to believe that she and Appellant were a couple or would be when she got older. (N.T. 10/4/19, 36).

When J.M. was fourteen and living in Delaware, she caught Appellant masturbating at the foot of her bed to pornography three times in a week. (N.T. 10/4/19, 25, 32-33). As he did so, J.M. feigned being asleep because she did not know what to do. (N.T. 10/4/19, 25). After the third night, she told her mother about Appellant's activities and she evicted Appellant. (N.T. 10/4/19, 25, 31). J.M.'s mother let Appellant return however and they remained together two more years before divorcing. During those two years Appellant at first treated J.M. respectfully but after a period of time, he again began acting inappropriately with her. (N.T. 10/4/19, 38). He would walk into her room when she was undressing and again began making inappropriate sexually suggestive comments to her and again started wearing sheer stockings. (N.T. 10/4/19, 38-39).

J.M. told Delaware authorities about the three incidents Appellant committed in her room

7

when was sixteen which led Delaware authorities to charge him with several offenses arising out of these three incidents, including two counts of indecent exposure to which he later pleaded guilty. (N.T. 10/4/19, 35-38).[5] As part of his sentence he could not have unsupervised contact with J.M.

Appellant also engaged in the same kind of inappropriate behavior with J.M. that he did with the complainant, including luring her to a bedroom with video games. (N.T. 10/4/19, 21, 39-40). The complainant said that she was afraid to say anything about it because of the way Appellant's family treated the complainant after she accused Appellant of sexual improprieties and that she was sorry for not warning J.M. about Appellant's behavior. (N.T. 10/4/19, 35, 39-40).[6] The complainant also informed J.M. that Appellant engaged in similar behavior with her starting when she was eight years' old. (N.T. 10/4/19, 41-44). When J.M. and the complainant compared the time period during which Appellant acted inappropriately with the complainant and her, J.M. saw that when Appellant started dating her mother, he stopped abusing the complainant. (N.T. 10/4/19, 40-42).[7]

J.M. also had contact with a third woman named H.L., her cousin, the daughter of J.M.'s mother's brother whose father was a close friend of appellant's. (N.T. 10/4/19, 43-45). She also described acts committed by Appellant upon her that were similar to those he exhibited with J.M. (N.T. 10/4/19, 44-45).

---

[5] J.M.'s mother reported the incident to authorities after J.M.,s therapist told her she had to do so. (N.T. 10/4/19, 37-39).

[6] Appellant's family shunned J.M. and asked her why she had accused Appellant of the acts described above. (N.T. 10/4/19, 33-34).

[7] J.M. related, *inter alia*, that the complainant told her that Appellant would mimic intercourse with her while they had clothes on, performed cunnilingus on her, exhibited behavior evincing a foot fetish as he did with J.M., wore stockings, and had her smoke marijuana. (N.T. 10/4/19, 42, 44).

On cross-examination, J.M. admitted that she did not witness any of the acts the complainant told her occurred. (N.T. 10/4/19, 47-48). She also stated that other people lived with Appellant, her mother, and her when they resided in Philadelphia and that Appellant worked sometimes during the day. (N.T. 10/4/19, 48-51).[8] She added that the complainant lived with her, her mother, and Appellant for one year and during that time, the complainant did not mention being assaulted by Appellant. (N.T. 10/4/19, 52-53).

J.M. testified that she told her mother about being bitten by Appellant and she told J.M. to tell him to stop it. (N.T. 10/4/19, 54). Although Appellant continued to bite her, she never mentioned it to mother again. (N.T. 10/4/19, 55). She estimated that Appellant gave her baths from when she was five until she was seven years' old when no one else was home and that she did not tell her mother that Appellant wore stockings while bathing her or that Appellant wrestled and tickled her inappropriately. (N.T. 10/4/19, 55-56, 58-60).

When asked about Appellant's work schedule, she said she recalled that he worked mostly part-time and was home when she arrived home from school and denied that Appellant and her mother worked during the same time of day. (N.T. 10/4/19, 56, 58-59). She did not recall Appellant being in a cast as a result of a work place accident from 1992-1994. (N.T. 10/4/19, 57). J.M. also indicated that she did not tell her therapist or the police about the other acts committed by Appellant and only mentioned his masturbating at the foot of her bed because she was not ready to discuss the other behavior. (N.T. 10/4/19, 69-73). When asked if she told others about Appellant's behavior and conduct, excluding the incidents that led to the charges filed by Delaware authorities, J.M. said that she told some friends and believed that she told the complainant about some of those incidents prior to 2011 when the complainant told her that

---

[8] J.M.'s uncle also resided with them. He suffered from a form of autism and attended a boarding school during the week. (N.T. 48-50)

9

Appellant had molested her also. (N.T. 10/4/19, 76-77). She, however, did not tell her brother or the complainant when the complainant resided with her and her family. (N.T. 10/4/19, 82-83).

With regard to Appellant's use of video games to lure the complainant, J.M. conceded that he did not use them to lure her but added that he used other items such as candy, money, or pornographic magazines to lure children to him. (N.T. 10/4/19, 78-80). She believed that Appellant did not use video games as a lure because he had to be more cautious with her because she was his step daughter. (N.T. 10/4/19, 79). J.M. also conceded that Appellant did not rub her vagina through her stockings, did not simulate having intercourse with her, have her get intoxicated, or perform cunnilingus upon her. (N.T. 10/4/19, 80). She pointed out though that Appellant wore stockings while with her and the complainant and that he committed acts indicative of having a foot fetish. (N.T. 10/4/19, 80-81, 83).

J.M. admitted that the complainant never told her that Appellant gave her baths, bit her, held her down and tickled her, or masturbated in her bedroom. (N.T. 10/4/19, 85-86). She did tell J.M. that he would rub his genitals against her vagina. (N.T. 10/4/19, 86).

On redirect examination, the prosecutor brought out, with regard to the incidents that occurred in Delaware, that Appellant told authorities that he had twice entered the room in which J.M. was sleeping and masturbated himself while watching a pornographic movie because J.M.'s mother would not fellate him. (N.T. 10/4/19, 91). He added that when those incidents occurred, he believed that JM. was asleep. (N.T. 10/4/19, 91-92).

H.L. and the complainant were longtime friends and H.L. became an in-law of Appellant when Appellant married H.L.'s aunt, the complainant's mother. (N.T. 10/4/19, 154). She also knew J.M. because they were cousins. (N.T. 10/4/19, 154). When H.L. was seven or eight years' old, between late 1992 till 1996, she was home alone recuperating from poison ivy when

10

Appellant, who lived close by with his mother and who H.L. trusted implicitly, came to her home to check on her because her parents were working. (N.T. 10/4/19, 155-156). When he arrived he asked H.L. for baby oil which he rubbed on her vagina after he moved the blanket on her and told her to spread her legs a little bit because he wanted to see "it." (N.T. 10/4/19, 155-156, 157). He then asked her if his rubbing her felt good and if she felt better before telling her not to tell anyone about what occurred. (N.T. 10/4/19, 156, 157-158). H.L. did not tell anyone about what happened. (N.T. 10/4/19, 158).

Approximately a year later H.L. would often go Appellant's and J.M.'s residence during the summer so that Appellant could watch her when her parents were at work. (N.T. 10/4/19, 158). She recalled that one day there was an incident involving Appellant and J.M.'s mother in their bedroom and she saw Appellant between J.M.'s mother's legs with a blanket over his head. (N.T. 10/4/19, 158-159). Later that day, Appellant and H.L. were alone his bedroom. (N.T. 10/4/19, 160). He asked her if she knew what was going on earlier and when she said that she did not, he opened a pornographic magazine and asked her if she wanted to try what was depicted in the photographs. (N.T. 10/4/19, 159). She did not know how to react and tried to laugh it off. (N.T. 10/4/19, 159). Appellant then laid H.L. down and kissed her as he stuck his tongue into her mouth. (N.T. 10/4/19, 159-160). He also began touching her vagina over her clothes and began licking it. (N.T. 10/4/19, 160-161).

On another occasion, Appellant had H.L. come and sit on the couch with him late one evening. (N.T. 10/4/19, 161-162). Appellant, who had a pornographic show playing on the television, had her get under a blanket with him and place her feet on his penis and testicles and rub them with her feet. (N.T. 10/4/19, 162). When the incident ended Appellant told her not to tell anyone about it. (N.T. 10/4/19, 162). H.L. did not tell anyone about it because she did not

11

know what to say because of how young she was and because she trusted Appellant, who was fun to be around and who she did not want to get in trouble. (N.T. 10/4/19, 163). As she got older, she became angry about what had occurred. (N.T. 10/4/19, 163). When H.L. turned ten or eleven years' old, Appellant stopped molesting her. (N.T. 10/4/19, 164).

H.L. finally told someone about the incidents after J.M. accused Appellant of having touched her inappropriately and no one in H.L.s family believed her accusations, including her father, who was friends with Appellant and the brother of Appellant's wife. (N.T. 10/4/19, 165-166). H.L. and J.M. lost contact with each other during their teenage years after J.M. and her family moved to Delaware. (N.T. 10/4/19, 166).

H.L. finally told someone about what had occurred when the complainant contacted her and asked her if Appellant had acted inappropriately with her. (N.T. 10/4/19, 166-167). She told the complainant about what Appellant had done to her and thereafter told J.M. as well. (N.T. 10/4/19, 167). After several discussions, H.L. contacted authorities and reported what Appellant did to her after the complainant had reported Appellant to authorities. (N.T. 10/4/19, 168-169).

On cross-examination, when asked if she was aware that Appellant worked all day during the period time H.L. said he rubbed her vagina, she replied that he worked sporadically and affirmed that he rubbed her vagina with baby oil. (N.T. 10/4/19, 171-172). She also partly recalled that Appellant may have had a cast on during the period of time when the alleged incidents occurred, but believed that the cast would not have prevented him from committing the acts she described. (N.T. 10/4/19, 174-175).

When asked if she recalled her parents asking her after J.M. reported that Appellant had masturbated in her presence and her denying that he had, H.L. said that she did not remember doing so but agreed that she would have denied it because she lacked the courage to do so. (N.T.

12

10/4/19, 176). She further denied that Appellant bit her, pinned her down, tickled her, masturbated in front of her, wear special clothing, or gave her drugs. (N.T. 10/4/19, 177). H.L. agreed with defense counsel that she suppressed the memory of what Appellant had done to her and that she first told her parents about the incidents after the complainant went to the police. (N.T. 10/4/19, 177, 178-181).

In his defense, Appellant first presented the testimony of one of his employers who testified that Appellant first began working for her company in 1990 and did until 1992 when he filed a worker's compensation claim due to a broken leg suffered at work. (N.T. 10/4/19, 189, 192). The employer conceded that Appellant's gross pay fluctuated week to week because he did not work the same number of hours every week and that pay records existed only for the first quarter of 1992 because the records pertaining to Appellant's employment had been accidentally destroyed. (N.T. 10/4/19, 189, 190-192).

Appellant testified in his own defense. He testified he was innocent of all of the accusations made against him by the three alleged victims, except for the time he masturbated in J.M.'s presence, and denied having committed the acts described by the complainant by stating that he could not have committed them because he was working during the periods of time she alleged that they occurred. (N.T. 10/4/19, 194, 210, 211-212). He indicated that during the time of day when the complainant said the incidents occurred in his parents' home, his mother, who seemed to be aware of everything happening in her home, was present in the home and that his father, a police officer, would sometimes be home as well depending on his schedule. (N.T. 10/4/19, 195-196).

He indicated that for the years 1987-1989, he worked as an auto mechanic for a company that was no longer in business and that although he tried, he could not obtain his work records

13

and also that he moved out of his parents' home in 1988 when he moved in with J.M.'s mother. (N.T. 10/4/19, 195, 198-199, 216). He also indicated that he got a different job in October of 1990 when he was no longer living in his parents' home and was living with J.M., her mother, and her mother's brother. (N.T. 10/4/19, 200). According to Appellant, he worked all day, and was at work during the time periods of the day when J.M. said the incidents occurred. (N.T. 10/4/19, 199-200). He further testified that his leg was broken while working in 1992 and that when he healed he got a new job in 1996 after he and his family moved to Delaware. (N.T. 10/4/19, 201-202).

Appellant also testified that the complainant never accused him of doing what she testified he did to her for many years and that she willingly spent time with him after he moved to Delaware, including moving into his home after he moved to Delaware, a time when she was suffering from drug addiction. (N.T. 10/4/19, 203-206). He stated that the complainant allowed her children to spend time alone with him. (N.T. 10/4/19, 206).

With regard to the charges he pleaded guilty to, Appellant testified that at the time, he and his wife were arguing frequently, they were no longer sleeping together, and he moved his clothing into the same room in which J.M. slept. (N.T. 10/4/19, 209). On the nights J.M. said Appellant masturbated in front of her, he explained that he was masturbating to a pornographic movie and did not know that she was in the room.(N.T. 10/4/19, 209). He stated that when J.M. saw what was happening, she did not say anything and rolled over at which time Appellant left the room. (N.T. 10/4/19, 2009). He admitted pleading guilty and denied having touched her feet. (N.T. 10/4/19, 210).

Appellant testified that after J.M. brought the charges against him in Delaware, he contacted H.L.'s parents to tell them what had occurred but denied that he contacted them

14

because he had a guilty conscience.(N.T. 10/4/19, 229). During this meeting, H.L. told her parents in front of him that Appellant had done nothing to her and that he was not nude in front of her. (N.T. 10/4/19, 211-212, 228, 229). According to Appellant, H.L. told her parents, "No, Uncle Bobby has never been like that." In response thereto, Appellant said he told her, "I thought you knew me better than that." (N.T. 10/4/19, 212).

During cross-examination, Appellant said that there were discrepancies in his gross pay possibly because he had taken sick or vacation time and that his pay records indicated that he did not work full time at least in the first quarter of 1992. (N.T. 10/4/19, 214-216). Appellant also surmised that the complainant falsely accused him of molesting her because he made her leave his shore house after she started an argument. (N.T. 10/4/19, 217-218). He said that he was unaware that the complainant and the other alleged victims first revealed in 2011 what Appellant had done to them and that the complainant often tried to have him invite her and her family in 2012 and 2013 to his shore house. (N.T. 10/4/19, 219).

Appellant denied ever wearing stockings and stated that he had just serendipitously found pornography on television when he was observed masturbating in J.M.'s presence. (N.T. 10/4/19, 224-225). He denied knowing that J.M. was in the room at the time and also denied that he went to that room to masturbate because it excited him knowing that she was present. (N.T. 10/4/19, 226). He also denied molesting H.L. or ever spending time alone with her as well as giving J.M. baths. (N.T. 10/4/19, 226-227). Finally Appellant stated that after J.M. filed charges against him, his sister and the complainant's step-father asked the complainant if Appellant had done anything to her and she denied that anything had happened. (N.T. 10/4/19, 230).

On redirect examination Appellant identified photographs taken in 2012 showing the complainant's husband and her children at his shore house. (N.T. 10/4/19, 232). He admitted

15

that it was the only time they came to his shore house and that subsequent thereto, they often asked if they could visit. (N.T. 10/4/19, 234).

Appellant also called as a witness Ms. Tracey Jean Clark. Ms. Clark and Appellant met at a July 4th party in 2007 and moved into together in 2008. (N.T. 10/4/19, 236). When she first met Appellant, his entire family was present, including the complainant, her husband, and the complainant's children. (N.T. 10/4/19, 236). It appeared to her that the complainant and Appellant had a good relationship. (N.T. 10/4/19, 236). That continued until at least 2012 when the complainant started a fight after she was asked to leave her shore house by noon so that Appellant and Ms. Clark could clean up before going home. (N.T. 10/4/19, 240-241). After that, the complainant and her family were not welcome at the residence and despite that, the complainant tried to have her children invited to the shore house a few times thereafter. (N.T. 10/4/19, 242).

In 2008, at the funeral for Appellant's father, Ms. Clark saw H.L. (N.T. 10/4/19, 237). During the proceeding, H.L. gave both Appellant and her a hug when paying her respects. (N.T. 10/4/19, 239). Ms. Clark also testified that Appellant had a good reputation for being peaceful and law-abiding and that she never saw him wearing pantyhose. (N.T. 10/4/19, 244, 245-246).

Finally, Appellant presented character evidence form several witnesses each of whom testified that Appellant had a good reputation for being peaceful and law-abiding. (N.T. 10/4/19, 256-257). Those witnesses indicated that Appellant's Delaware convictions did not change their opinions of Appellant's character. (N.T. 10/4/19, 257).

In rebuttal, the Commonwealth called J.M.'s mother as a witness. She testified that she and Appellant began their relationship in March of 1991 and not in 1988 as Appellant testified. (N.T. 10/4/19, 260-261). They moved in together six months later and she indicated that she did

16

not know Appellant in 1988. (N.T. 10/4/19, 261). On cross-examination the witness conceded that she met Appellant at a Christmas party hosted by her brother but demurred when asked if that party occurred in 1987 by stating that she did not know what year that party was held. (N.T. 10/4/19, 263).

## DISCUSSION

In his 1925(b) Statement Appellant first argues that the verdicts were against the weight of the evidence. In support of this claim, he argues that the complainant lied when testifying about who she told about the incident and when she did so, did not tell family members about the abuse, he offered unrebutted testimony that he was at work when the complainant testified the incidents occurred, and the complainant spent time with Appellant after the incidents occurred. Appellant's 1925(b) Statement, Issue 1. It is respectfully suggested that Appellant be denied relief with regard to this claim because this Court did not commit an abuse of discretion by denying Appellant's post-sentence weight claim.

The standard in reviewing a weight of the evidence claim is well-settled:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Commonwealth v. Clay, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis and citations omitted); see also Commonwealth v. Sanchez, 36 .3d 24, 27 (Pa. 2011) (stating that "[r]elief on a weight of the evidence claim is reserved for extraordinary circumstances, when the jury's verdict is so contrary

17

to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be give n another opportunity to prevail." (citation omitted)).

The initial determination regarding the weight of the evidence is for the fact-finder. Commonwealth v. Jarowecki, 923 A.2d 425, 433 (Pa. Super. 2007). The trier of fact is free to believe all, some or none of the evidence. Id. A reviewing court is not permitted to substitute its judgment for that of the fact-finder. Commonwealth v. Small, 741 A.2d 666, 672 (Pa. 1999). When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, appellate review of a trial court's decision is extremely limited. Unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, weight of evidence claims shall be rejected. Commonwealth v. Rossetti, 863 A.2d 1185, 1191 (Pa. Super. 2004). Finally, "The trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." Commonwealth v. Nypaver, 69 A.3d 708, 717 (Pa. Super. 2013).

Applying the foregoing to the instant matter, shows that the verdict did not shock the conscience. This Court rejected Appellant's weight claim because the complainant's testimony, considered in its entirety, positively established Appellant did the acts she ascribed to him. This Court found her testimony wholly believable despite some inconsistencies in it. Those inconsistencies were not weighty enough for this Court to conclude that the complainant lied about the sexual assaults.

In addition, although Appellant claims that he presented unrebutted evidence indicating that he worked full time and thus, could not have committed the acts the complainant accused him of committing when the complainant testified they occurred, the evidence introduced by Appellant concerning his work record did not establish that Appellant could not have committed

18

the crimes because the evidence was limited in scope as it did not cover the entire period of time the complainant alleged that she was molested. Also, the limited amount of work related evidence Appellant presented showed that Appellant worked varying hours each week thereby establishing that he could have been present when the complainant said he was and not at work as he claimed.

Finally, although the evidence did indicate that the complainant spent time with Appellant after the incidents underlying the convictions occurred, those facts did not call into question this Court's assessment of the credibility of the complainant. The incidents occurred when she was very young and family dynamics made her reluctant to accuse Appellant of molesting her. In fact, one of Appellant's other victims was rebuffed when she revealed to her family what Appellant had done to her. In this Court's view, the complainant's conduct years after the incidents occurred when in Appellant's presence did not shake this Court's credibility determination regarding the complainant. Since a challenge to the weight of the evidence questions which evidence is to be believed, Commonwealth v. Charlton, 902 A.2d 554, 561 (Pa. Super. 2006), and this Court overwhelmingly believed the complainant, it is submitted that the order denying Appellant's weight of the evidence claim should be affirmed because this Court did not commit an abuse of discretion by denying it. See also Commonwealth v. Blackham, 909 A.2d 315, 319 (Pa. Super. 2006) (fact-finder is responsible for resolving questions of credibility, and is free to believe all, some, or none of the evidence presented). The fact that it resolved those inconsistencies in favor of the Commonwealth does not render the evidence against the weight of the evidence; Commonwealth v. Boxley, 838 A.2d 608, 612 (Pa. 2003) ("Appellant's counsel raised these credibility issues at trial, and they were weighed and rejected by the jury in reaching its verdict... . As we will not disturb the finder of fact's credibility determinations,

19

appellant's claims fail); Commonwealth v. Small, 741 A.2d 666, 673 (Pa. 1999), cert. denied, 531 U.S. 829 (2000) (All of the matters complained of by appellant ... were issued argued by appellant's counsel during trial and were properly weighed and rejected by the jury before it reached its verdict").

Accordingly, for the reasons stated, Appellant's claim concerning the weight of the evidence has no merit and it is respectfully suggested that the order dismissing Appellant's post-sentence motion be affirmed.

Second, Appellant asserts that Judge Perez committed an abuse of discretion by granting the Commonwealth's Pa.R.E. 404(b) Motion. Appellant argues that the motion should have been denied because there was not a factual nexus between what occurred to the complainant and the two bad acts witnesses and thus, any similarities were too generic to meet the requirements for the introduction of other crimes evidence. He further contends that the prejudice stemming from the introduction of that evidence outweighs any probative value the evidence possessed and therefore, Judge Perez should have denied the Commonwealth's motion.. Appellant's 1925(b) Statement, Issue 2. It is suggested that relief be denied with respect to this claim.

This Court begins by noting that evidence is relevant if it tends to establish some fact material to the case or tends to make the fact at issue more or less probable. Commonwealth v. Davenport, 342 A.2d 67 (Pa. 1975). Determination of the relevancy of evidence offered at trial requires a two-step analysis. It must be determined first if the inference sought to be raised by the evidence bears upon a matter in issue in the case and, second, whether the evidence renders the desired inference more probable than it would be without the evidence. Commonwealth v. Stewart, 336 A.2d 282 (Pa. 1975). Even if evidence is determined to be relevant, it is to be

20

excluded if its potential prejudicial impact outweighs its probative value. Commonwealth v. Wax, 571 A.2d 386 (Pa. Super. 1990).

Pa.R.E. 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"A trial court's ruling on evidentiary questions is within the sound discretion of that court and will not be reversed absent a clear abuse of discretion." Commonwealth v. Reefer, 573 A.2d 1153 (Pa. Super. 1990).

With regard to other crimes evidence, "[I]t is well established that evidence of other criminal activity generally is inadmissible against a defendant at his trial on another unrelated charge. Commonwealth v. Roman, 351 A.2d 214 (Pa. 1976); Commonwealth v. Groce, 303 A.2d 917 (Pa. 1973)." Commonwealth v. Stokes, 421 A.2d 240 (Pa. Super. 1980). "The Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." Commonwealth v. Stanley, 398 A.2d 631 (Pa. 1979).

> "The general rule prohibiting the admission of evidence of prior crimes nevertheless allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the other; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other."

21

Commonwealth v. Banks, 521 A.2d 1, 17 (Pa. 1987) (quoting Commonwealth v. Morris, 425 A.2d 715 (Pa. 1981)).

Evidence of distinct crimes is not admissible against a defendant being prosecuted for another crime solely to show his bad character or his propensity for committing criminal acts. Morris, 425 A.2d at 720 (1981). Such evidence is not admissible to show the defendant's general criminal proclivities. Commonwealth v. Seiders, 614 A.2d 689 (Pa. 1992).

> "The often-stated rule in Pennsylvania governing evidence of other crimes is that such evidence is not admissible solely to show a defendant's bad character or propensity for continuing criminal acts. [footnote omitted] Commonwealth v. Billa, 521 Pa. 168, 555 A.2d 835 (1989). At the core of the general rule is what Wigmore termed 'a peculiar Anglo-American solicitude for the accused.' I J. Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 194 at 646 (3d ed. 1940). It is essential, both to the accused and to our system of criminal justice, that an accused obtain a trial on the specific charges against him and that he not be convicted on grounds that he possesses a criminal nature."

Seiders, 614 A.2d at 690-691 (footnote omitted).

Pa.R.E. 404(b) provides:

> (b) Other Crimes, Wrongs, or Acts
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

22

Here the Commonwealth, *inter alia*, argued that the evidence was admissible to show common plan, scheme, or design. (N.T. 5/6/14, 32). The evidence in question clearly fit under that exception to the general rule.

Other crimes evidence is admissible as proof of a common scheme, plan, or design "where the crimes are so related to each other that proof of one tends to prove the others." Commonwealth v. Elliott, 700 A.2d 1243 (Pa. 1997), *cert.* denied, 524 U.S. 955 (1998). "The existence of a common scheme is relevant to establish any element of a crime (e.g., the identity or intent of the perpetrator), so long as it does not merely indicate the defendant's propensity to commit similar crimes." Commonwealth v. Bronshtein, 691 A.2d 907, 915-16 (Pa.1997), *cert.* denied, 522 U.S. 936 (1997). In order for separate crimes to be deemed a part of a common scheme, plan, or design, "a comparison of the crimes must establish a logical connection between them." Commonwealth v. Miller, 664 A.2d 1310, 1318 (Pa. 1995), *cert.* denied, 516 U.S. 1122 (1996). "This will be true when there are shared similarities in the details of each crime." Commonwealth v. Keaton, 729 A.2d 529, 537 (Pa. 1999), *cert.* denied, 528 U.S. 1163 (Pa. 2000).

The common scheme, plan or design exception to the general rule prohibiting the admission of other crimes evidence does not require that the crimes be so nearly identical as to bear a distinctive signature; rather, it "requires only that there are **shared similarities in details of each crime**" and that these similarities may include the perpetrator's actions, the location of the crimes, and the commonality in the relationship of the accused and the victims. Commonwealth v. Newman, 598 A.2d 275, 278 (Pa. 1991) (emphasis added). Accord Commonwealth v. Robinson, 864 A.2d 460, 481 (Pa. 2004), *cert.* denied, 546 U.S. 983 (2005); Commonwealth v. Andrulewicz, 911 A.2d 162, 168-69 (Pa. Super. 2006), appeal denied, 926 A.2d 972 (Pa. 2007).

23

In determining whether there was a common scheme, plan or design when offenses are committed against multiple persons, a very important factor is whether the defendant chose similar victims, such as people who have a common relationship with him. *E.g.* Commonwealth v. Elliot, 700 A.2d 1243, 1250 (Pa. 1997), *cert.* denied, 524 U.S. 955 (1998) (victims were white women in their twenties); Commonwealth v. Gordon, 673 A.2d 866, 869 (1996) (lawyer's sexual assault victims were each clients); Commonwealth v. Miller, 664 A.2d 1310, 1318 (Pa. 1995), *cert.* denied, 516 U.S. 1122 (1996) (victims were heavy-set African-American women); Commonwealth v. Hughes, 555 A.2d 1264, 1282 (1989) (victims were young non-Caucasian females with whom appellant knew previously).

Instantly, appellant victimized young girls each of whom had family ties to him. He used similar methods to make them comfortable, such as the use of video games and pornography, and slowly groomed them to accept his advances. He also took advantage of his position as an adult figure in their lives to silence them and usually acted in the afternoon while serving as a baby sitter of sorts to the victims. In addition, with some of the victims, he wore women's stockings and with others exhibited a foot fetish. Also, the victims were similar in age and thus, particularly vulnerable and their families either were related to Appellant or friends with him. Given these striking similarities, there was a logical connection among the victim such that the crimes were part of a common plan, scheme, or design. See Commonwealth v. G.D.M., 926 A.2d 984, 987-88 (Pa. Super. 2007) (G.D.M.'s prior sexual assaults of daughter admissible to show common scheme in prosecution for abuse of son where abuse of son began when abuse of daughter ceased, both were assaulted in the family home, and nature of molestation was similar); Commonwealth v. Luktisch, 680 A.2d 877, 878-79 (Pa. Super. 1996) (evidence of Luktisch's prior sexual abuse of stepdaughter and daughter admissible as common plan at trial for sex

24

assault of second stepdaughter where the three victims were the same age when Luktisch began molesting them; each were related to him and were living with him when abuse occurred; and acts performed on each victim were similar); Commonwealth v. Miller, 664 A.2d at 1318-19 (evidence of appellant's subsequent rape/assault was admissible at his trial for prior murders of two women to establish common design by appellant in luring victims of similar race and weight into his car, taking them to remote areas to force sex upon them, and attempting to kill or killing them); Commonwealth v. O'Brien, 836 A.2d 966, 970 (Pa. Super. 2003) (prior bad acts evidence properly admitted under common plan, scheme, or design exception where victims of previous sexual assaults were similar in age to victim in case being tried, they and their families either were friends or related to defendant, and defendant showed each boy pornography before assaulting him).

In addition, presenting the testimony of the other victims of Appellant was clearly relevant and important because it supported the credibility of the complainant in the face of appellant's denials that he did not commit the crimes he was accused of committing against the complainant. See Commonwealth v. Hacker, 959 A.2d 380, 393 (Pa. Super. 2008)[9] ("evidence of a common scheme, plan or design involving various similarly situated complainants is relevant to bolster the credibility of those complainants"); Commonwealth v. O'Brien, 836 A.2d 966, 970 (Pa. Super. 2003) ("the admission of the evidence of the prior crimes was relevant to establish a common scheme, plan or design and, thus, bolster the victim's credibility"). The other crimes evidence was especially important in the instant matter because appellant's entire defense consisted of an attack on the victims' credibility. Appellant also asserted that the victims had a motive to lie and that they did so in retaliation for appellant's actions. Thus, it was highly

---

[9] The Superior Court's decision was reversed on other grounds by the Pennsylvania Supreme Court. Commonwealth v. Hacker, 15 A.3d 333 (Pa. 2011)

imperative that the Commonwealth be permitted to bolster the victims' credibility by demonstrating that appellant had engaged in a common plan, scheme, or design with other young girls who were close to the age the complainant was when the incidents occurred and who either were family members or close friends of Appellant. See Commonwealth v. Gordon, 673 A.2d 866, 870 (Pa. 1996) (common scheme, plan, or design other crimes evidence properly admitted to bolster credibility of victim given defendant's denial of the crime and because victims' testimony was mostly uncorroborated). Thus, it is clear that the evidence was admissible and probative.

Further, it is clear that the probative value of the evidence was not outweighed by any prejudicial effect it may have had. In determining whether evidence is admissible, the trial court should balance the relevancy and evidentiary need for the evidence of distinct crimes against the potential for **undue prejudice.**" Commonwealth v. Rogers, 615 A.2d 55, 59 (Pa. Super. 1992) (emphasis added); Pa.R.E. 404(b)(3). Undue prejudice "is not simply prejudice in the sense that [defendant] will be linked to the crime for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of all Commonwealth evidence... [R]ather [undue prejudice is] that which would occur if the evidence tended to convict [defendant] only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." Commonwealth v. Lark, 543 A.2d 491, 499 (Pa. 1988); see also Commonwealth v. Rigler, 412 A.2d 846, 852 (Pa. 1980) ("all of the prosecution's evidence is intended to 'prejudice' the jury, and simply because it is damaging to the defense is no reason to exclude the evidence"), cert. denied, 451 U.S. 1016 (1981).

Here, the Court recognized that the reason for which the Commonwealth sought the introduction of the evidence at issue and did not misuse that evidence or consider as propensity

26

evidence. Because the case was heard by this Court without a jury it is presumed that this Court did not misuse the evidence or consider it as propensity evidence. See Commonwealth v. Brown, 486 A.2d 441, 443-44 (Pa. Super. 1984) (trial judges sitting as fact finders are presumed to ignore evidence that is inadmissible or prejudicial). Thus, for all of the foregoing reasons, appellant did not suffer undue prejudice and any prejudice engendered by the admission of the evidence did not outweigh its probative value as appellant claims.

Accordingly, for all of the foregoing reasons, it is suggested that Judge Perez's ruling be affirmed for the reasons stated.

Third, Appellant argues that this Court committed an abuse of discretion by limiting the defense from cross-examining the complainant about her multiple interactions with Appellant following the incident and from introducing photographs showing the complainant and Appellant together taken at various times and places after the incidents underlying the convictions occurred. Appellant submits that had the prohibited cross-examination been allowed, the testimony stemming from the examination and the introduction of the photographs would wholly have undermined the complainant's credibility such that Appellant would have been acquitted had this Court heard it and examined the photographs. Appellant further claims that the evidence also would have supported the defense's theory that the complainant made the allegations underlying the charges because he banned her from visiting his shore house. Appellant's 1925(b) Statement, Issue 3.

Recently, in Commonwealth v. Jermaine Jackson, 347 EDA 2019, 2020 WL 4436293 (Pa. Super. 2020) (Table), a three-judge panel of the Superior Court issued a memorandum addressing a similar issue and found against the defendant. The Court set forth the applicable law as follows:

27

The right to cross-examine witnesses, although fundamental, is not absolute. Commonwealth v. Rosser, 135 A.3d 1077, 1088 (Pa. Super. 2016) (*en banc*). "A trial court has discretion to determine both the scope and the permissible limits of cross-examination. The trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law." Commonwealth v. Briggs, 12 A.3d 291, 335 (Pa. 2011) (quotation marks and citations omitted).

The Confrontation Clause of the Sixth Amendment of the United States Constitution provides a defendant with a constitutional right "to conduct cross-examination that reveals any motive that a witness may have to testify falsely." Commonwealth v. Bozyk, 987 A.2d 753, 756 (Pa. Super. 2009). However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. Moreover, "[a] defendant's right of confrontation includes the right to cross-examine witnesses about possible motives to testify. However, a witness may not be contradicted on 'collateral' matters, . . . and a collateral matter is one which has no relationship to the case at trial." Commonwealth v. Saunders, 946 A.2d 776, 786 (Pa. Super. 2008) (citation omitted).

Applying the foregoing to the instant matter indicates that relief should be denied with respect to this claim because this Court did not commit an abuse of discretion by limiting defense counsel's cross-examination and preventing the introduction of the photographs. In both instances, the testimony and evidence was cumulative of evidence already presented at trial. As noted above in the discussion of Appellant's second issue, cumulative evidence is excludable even if relevant.

This Court heard the complainant testify regarding the complainant's interaction with Appellant following the incident, saw photographs depicting Appellant and the complainant in each other's company, and Appellant testified that he and the complainant were often together

28

and that she frequently contacted him when she needed items in her home repaired. (N.T. 10/4/19, 108, 119-120, 123-124, 143-145147-148, 203-206). Appellant's testimony established to the satisfaction of this Court that he and the complainant were in each company on numerous occasions numerous times in the years following when the incidents occurred and that the complainant did not manifest that anything wrong or illegal had occurred between them when she was in Appellant's presence. (N.T. 10/4/19, 203-206). Therefore, no useful purpose would have been served by presenting additional evidence cumulative to what already had been established by previously admitted evidence.

This Court, sitting as fact-finder, also considered the defense's theory that the complainant accused Appellant of the heinous acts she described in retaliation for his having banned her from his shore house. Additional evidence on this point would not have convinced this Court, however, that she falsely accused Appellant and that her allegations against him were false because she had told others about the sexual abuse before she argued with Appellant and was banned from the shore house.

Accordingly, for all of the above reasons, it is respectfully suggested that no abuse of discretion occurred here and the instant claim be deemed lacking in merit.

In his final claim, Appellant asserts that this Court committed an abuse of discretion by precluding the defense from calling various witnesses. First, he contends that the complainant's brother should have been permitted to take the witness stand and testify that the complainant often invited Appellant to come to her home years after the alleged sexual assaults occurred to perform handyman tasks. In appellant's view, the testimony it sought to introduce would not have been cumulative because the complainant testified that she did not want to have contact with Appellant. Appellant's 1925(b) Statement, Issue 4(a).

29

Second, Appellant contends that this Court should have permitted the defense to call two witnesses who allegedly would have testified that the complainant tried to "recruit" them to assert that Appellant committed improper acts with them even though no such thing happened. He argues that the error requires the grant of a new trial. Appellant's 1925(b) Statement, Issue 4(b).

Regarding the first claim alleging that Appellant should have been permitted to call the complainant's brother as a witness, it is respectfully suggested that the claim be rejected because this Court properly sustained the Commonwealth's objection. That is the case because the testimony Appellant wished to present would have been cumulative of testimony and evidence already presented. As noted above, this Court heard from various witnesses, including the complainant, that the complainant had contact with Appellant, often at her behest, on numerous occasions and that she wanted to visit Appellant's shore house. Additional evidence on that issue therefore was not necessary and would not have either made the point clearer for this Court or, more importantly, resulted in a different outcome.

Appellant's second claim in this issue should also be deemed lacking in merit. The claim lacks merit because the fact that Appellant did not molest other family members would not have established that Appellant did not molest the complainant. Also, the testimony was irrelevant because the prosecutor indicated that in the statements the purported witnesses gave, he merely stated that the witnesses and the complainant were often in Appellant's presence and that he and the complainant always acted appropriately when in his presence. (N.T. 250-251). That evidence had little relevance because the acts underlying Appellant's convictions occurred in private when no one else was present. The fact that the witnesses never saw or experienced inappropriate behavior when others were present was, certainly excludable for this reason.

30

Also, the Court had already heard evidence that Appellant acted appropriately when in the complainant's company. Additional evidence on that issue was properly excluded on grounds that it was cumulative of other evidence.

Finally, while the defense averred that the witnesses would testify that the complainant tried to "recruit" them, that claim did not make their testimony relevant and admissible because it merely would have shown that the complainant likely asked them if Appellant also had molested them. The defense presented no evidence to support its claim that the complainant tried to convince them to falsely accuse Appellant of having molested them in order to bolster her case against him. Thus, the evidence was irrelevant and no error occurred by excluding it.

Accordingly, it is suggested that no relief be granted on this claim.

## CONCLUSION

Based on the foregoing, it is respectfully suggested that the judgment of sentence be affirmed.

BY THE COURT,

Date: 8/13/20

Jeffrey P. Minehart, J.

31

## CERTIFICATION OF SERVICE

I, Stacy Bauer, secretary to the Honorable Jeffrey P. Minehart hereby certifies that on the

___13TH___ day of August, 2020, by first class mail, postage prepaid, a true and correct copy of

the attached opinion was served upon the following:

David B. Mischak, Esquire
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103

Lawrence J. Goode, Esquire
Chief-Appeals Unit
Office of the Philadelphia
District Attorney
Three South Penn Square
Philadelphia, PA 19107

*Stacy Bauer*
Stacy Bauer, Esquire

32